Alright, our last case this morning because we have one case submitted on the briefs is number 20-10503 Matthew Shantz versus Mr. Jones. Thank you, your honor. May it please the court. I'm Craig Jones. I'm coming to you by satellite from Washington, Georgia, which is between Athens and Augusta. My client is a young man named Matthew Shantz, who was the only child raised by a Jewish mother in Warner Robins, Georgia, who got a brand new motorcycle for his birthday. So what could possibly go wrong? It's undisputed that Mr. Shantz, my client, committed inexcusable traffic violations after Aplin County deputies attempted to stop him for not having a license tag on his new motorcycle. And he was willing to own up for his mistakes by pleading guilty and agreeing to serve and a year in prison for those violations. He pled guilty under a felony eluding statute based solely upon high speed. So there is no heck, the Humphrey defense has been raised in this case, simply driving too fast. He went to prison for a year. What is disputed, however, is whether he should have also been subjected to the additional extrajudicial punishment of being shot and seriously injured when he stopped at a roadblock, turned his bike around at the sight and sound of a rack shotgun, and then took off in the opposite direction. There's a jury question in this case as to whether the sheriff, the sheriff, the elected high sheriff of Aplin County, 77 years old at the time, whether the sheriff who shot a fleeing traffic offender driving a motorcycle away from a roadblock with no persons or vehicles in his path made an unreasonable decision to use deadly force in violation of the Fourth Amendment. In other words, stated differently, was it objectively reasonable to shoot a fleeing motorcyclist who testified that he was trying to avoid officers by driving away from them, not toward them. And when the physical evidence and expert testimony corroborates his account, here's here's the here's the issue I I want to ask you to address. You you you catch this as you just did and in your briefs as he is fleeing the officers. But at the point when he was shot, he had already committed a felony and he was continuing to lead the high officers on a high speed chase. So isn't that how we have to look at it? Is it? I mean, the way I explain to me why this is wrong, I guess, but isn't the right way to look at it. This is an officer trying to stop someone who is participating in a high speed chase and he chose to use lethal force to do so. Well, during the facts and the like, most favorable to Mr. Shantz, which we have to do under Rule 56 and under the Supreme Court's recent admonition, totally cut. Now, this was not so much a high speed chase as it was a a series of brief encounters between Mr. Shantz and police officers. Mr. Shantz was initially was initially spotted in, I believe it was Perry, Georgia. Officer tried to pull him over. He he took off immediately, wasn't seen again for another 20 minutes or so. Another county. And then he encountered a roadblock. He made a he went on to a side road, altered his course and then later encountered another roadblock. And it was at this roadblock where he saw the sheriff and made a U-turn and was shot in the process of making the U-turn. But essentially what you got here is a guy who's an experienced motorcycle racer. You're going to if you get deep and if you do a deep dive in the depositions, you'll see some of these officers are actually in awe of his ability to operate the motorcycle. I mean, he literally disappeared. He was out of sight. So most of the times I don't even know you could consider this a chase. Also, it's his testimony. And and I think this is verified by the video if it's available to the extent that he's visible on it. He is not driving. He's driving fast, but he's not endangering the public. I think he ran into he did go through one red light, but he stopped, slowed down, looked both ways and did so safely, unlike the many officers who went flying through the red light with their blue lights and sirens on. Yeah, I mean, I mean, it seems a little bit to me like you're arguing that because he's a very good criminal that we shouldn't care about the crimes he was committing. Here's here's a question I have to you. What what was the sheriff supposed to do when he confronted this motorcycle at a roadblock that was set up to stop the motorcycle from going? I mean, what was he supposed to do? Well, as a as the Supreme Court said in Tennessee, be guard or, you know, sometimes sometimes the bad guy gets away. And if the measure is that, gee, everybody has to be caught and what happens to get away, then that would basically give officers a license to shoot anyone who would run a red light 20 minutes earlier. The question is not the guy is not committed any violent felony. He is not he is not posing an immediate threat to anyone in his path. It's not like he's driving through a school zone or something like that. The case law, there are many cases have been cited by this court as well as the Supreme Court, which involve, you know, people engaged in potentially dangerous behavior to someone who may or may not be around the curb. But you're not justified in in killing them or trying to kill them simply because it's just like me, because we've got you're you're arguing that this was an unconstitutional use of force. Yes, merits. But we also have to deal with qualified immunity. Yes. Qualified immunity requires that an officer, even an officer that may have done something that after the fact we think was unconstitutional, that officer had to at the time of his action be on notice, fair notice that what he was doing is unconstitutional. And I just think you have a real uphill climb here when you've got the Supreme Court and where not only with the officers not be on notice here with this high speed chase, it almost seems as if the case law would have supported them and their notion that this dangerous high speed chase was something that at some point needed to be stopped. So if you could respond to me what it is, what law you think, what case would have alerted these law enforcement officers or this particular officer that what he did was was not permitted? OK, well, first of all, this case, this case succinctly summarized the ruling Garner back in 1994 by saying that were the suspects not a fling felon and poses no immediate threat. Your client was a fling felon, wasn't he? At some point, he also posed no immediate threat to the officer or others. I mean, both of these are required. You can't shoot somebody just because they're fling felon. Well, tell me, I know Garner. Tell me about Plumhoff. What do you say about Plumhoff? Harold V. Decatur County that I was talking about. And so earlier than that, in 1985, in the Mercado case, this case, this court, even before Garner, based upon earlier, I'm sorry, Mercado was in 2005 and they said that this would be a there was no qualified immunity in a similar situation. Von V. Cox is probably most on point because Von V. Cox, unlike this case, actually was a dangerous pursuit. This was on a crowded interstate highway. I-85 south of Atlanta. Cars in every lane. This is not a pursuit case. This is somebody running, avoiding a roadblock. There was nobody behind him when this happened. Von V. Cox, you had a you had a vehicle towing a stolen boat on a trailer, which had actually made contact with the one of the pursuing vehicles at one point. An officer fired, fired a shot, ended up killing one of the occupants of the vehicle. This court in Vaughn held in 1998 that the state of the law gave fair warning that the alleged conduct was unconstitutional, even in the absence of a factually similar precedent. Well, Mr. Jones, let me ask you, let me ask it a different way. Could you address for me why Plumhoff and why Harris to U.S. Scott v. Harris, two U.S. Supreme Court cases that approved abuse of deadly force in a high speed chase, why that would not have actually caused a reasonable officer would have not prompted a reasonable officer to think that what he was doing here was wrong. If you could address. Well, I would say I was the losing attorney in Scott v. Harris. I know a little bit about that. That was a that was a collision case. It wasn't a wasn't a shooting. And the holding of that case was limited to the fact that they basically couldn't believe that the 11th Circuit rule in favor of a plaintiff in a in a in a qualified immunity case. And they could find the decision to the facts of that case and what that officer did in that case was not a violation of clearly established law. That was the end of the story. Now, in Plumhoff, let me Plumhoff involved a motorist who had already rammed his vehicle into a police car, was threatening to do it again. That was the same situation in the small versus Glen County case that this same trial court granted a qualified immunity on. We didn't have anything like that here. Um, all the cases, the other cases is essential from Brousseau v. Hagen, Paisley, Copa Bianca, Monix v. Luna, Long v. Slayton, Willis v. Monk. These are all involved people who've engaged in assaultive behavior or police officers who are using or threatening to use their vehicles as a weapon. And that is not what we have in this case. And then the other the other difference, probably the biggest difference we have between this case and those cases is that the fleeing motorists in those cases did not live to tell their story. And all the courts have is the unrebutted version of the police officer about what happened. In this case, we've got a guy who survived. We got Mr. Chance, whose own story rebuts the officer's version and is also corroborated by physical evidence, which I'll show you here in my rebuttal time, which essentially confirms based on physical evidence that he was driving away from the officer, not toward the officer as the officer claims. The officer didn't claim he was shooting this man because he was afraid he was endangering other people. He claimed he shot him because he thought he was endangering himself, and that's simply not supported by the evidence. Right. Thank you very much, Mr. Jones. Thank you, Mr. Carter. Thank you, your honor. I think we we need to look at the facts of this case from the start of Mr. Chance's day on June 17th, 2016. He testified that prior to leaving his house, he smoked marijuana. He had marijuana in his possession and he had no tag on his motorcycle. So he was violating the law from the time he started this trip. He drove from Perry, Georgia, down 341, which is Golden House Highway, towards St. Simon's Island. And when he drove into Appling County, Georgia, Deputy Tim Sullivan noticed that his motorcycle did not have a tag. He turned around and followed him. And Mr. Chance, instead of stopping to prevent all this, took off at a high speed. Mr. Chance testified in his deposition that if he had stopped, none of this would have happened. He knew what he was doing, and he was evading the police officers, and he was putting lives in danger by driving in excess of 100 miles an hour on this motorcycle from Appling County to Wayne County, which is over 30 miles. Mr. Carter, let me ask you two questions. They're different. So let me just take a couple of minutes of your time if I could. Absolutely. The first one is a hypothetical. Okay. Okay, so it's not this case. Right. But we have to write an opinion in this case, and I wanna see what you think about the parameters of your position with regards to what happened. Okay. If Mr. Chance had evaded detention without speeding or running a red light, but had just gotten lucky, he just didn't stop, but he was driving within the speed limit, and the police hadn't been able to catch up to him, but he was following all other traffic rules, comes up to the roadblock, and then tries to take off, could deadly force have been used? Well, if Sheriff DeLoach did not have any information that he was putting others at risk, then maybe not. But that's not the facts of this case. I know, Mr. Carter, I know that. I understand. It's a hypothetical, and I told you it's not this case. I understand very clearly that it's not this case. I just wanna figure out the limiting principles for whatever it is that we have to write. And so if he had not been speeding- Okay. And had not run a red light, had just simply driven within the speed limit, but had not stopped, and had been able to avoid detention, he probably could not have been shot, correct? If I understand your hypothetical, the officer tried to stop him, he did not stop. He just didn't stop, and he was driving the speed limit, and the officer just couldn't catch up to him, and then Mr. Chance hits the roadblock. And then when he hits the roadblock, he turns around, tries to go the other way, and then he gets shot. Is there a Fourth Amendment violation? Well, I don't know that there's, I certainly think the officer may be entitled to qualified immunity, but- That's not my question. So I'm proceeding in different- If he's not speeding and he's not a felon, then it probably falls within Tennessee versus Garner. That he's- I think that's the right answer, at least from my perspective. If he is not endangering others during his attempt to avoid capture, you can't shoot him to stop him, right? Like I say, I think that becomes more within the line of Tennessee versus Garner, where you had just a purse snatcher that was jumping a fence, and he was shot. Right, okay, that's my impression, too. Correct. I know that's not this case. Correct. So now, on this case, Mr. DeLoach said different things in his deposition and his affidavit. In his deposition, he said nothing about the fear for the safety of others. He does say it in his affidavit. How do we treat those differences at summary judgment when we're supposed to view the evidence in the light most favorable to Mr. Shantz? He wasn't asking his deposition about whether there was any concern for the safety of others. What was he asking? He had asked what he thought when Mr. Shantz accelerated, and he feared for his own safety. No, but the answer to that question is you feared for your safety and the safety of others. If the question is that open-ended, you're expected to say, these are my reasons for using deadly force. I was afraid for my life and my safety. And given his speeding, I was afraid for the life and safety of others, too. He only says one, not number two, and then in his affidavit, both of them appear. So what do we do with that on summary judgment? Well, I think that, again, I think the affidavit can certainly supplement his deposition testimony. No doubt. I don't think that those are mutually exclusive. I think Mr. Deloach- I'm not saying you strike one, but you've gotta view the evidence in the light most favorable to Mr. Shantz. And so, which of Mr. Deloach's version of events do you take? The deposition or the affidavit or both? I think you take both. I think you take the deposition where he said he feared for his safety, and you take the affidavit where he expands on that and says he feared for the safety of himself and others because of all of this information that he knew from listening to the radio traffic. I don't think the deposition testimony was limiting where that was the only answer he was given. Mr. Jones had every opportunity to ask him as many questions as he wanted to. But you have a situation where Mr. Deloach, and I think Mr. Deloach, Sheriff Deloach, was entitled to use excessive force based on the fact that he feared for his own safety. He knew this- I don't think you wanna use those words. You mean deadly force, not excessive force. I'm sorry, that's exactly. I mean, he was entitled to use deadly force if he feared for his own safety, which he did. You have a kid that is shown no effort to stop. He knew he was supposed to stop, and he was attempting to elude again when he stopped where Sheriff Deloach actually fired the weapon. He was in danger. Let me ask you a question to follow up on Judge Jordan's hypothetical. Sure. One of the things that it seems like the Supreme Court is saying is that there's a difference between people who are eluding in vehicles that can run people over and injure people, and people who may be eluding the police just on foot. That if you're running away from the cops, you're not really creating any sort of, I mean, physically running. You're not really creating any sort of danger for anybody. But that really, whenever you're driving a vehicle, even if you're just driving 65 in a 70 mile an hour zone, there's danger that you're creating because you're eluding the police. What do you think about that? Well, I think that's absolutely correct. And I think Plumhoff and Mullenix and Small, the cases that Judge Carnes asked about earlier, all make that clear. And I think in this case, even plaintiff's own expert admitted that this motorcycle traveling in speeds in excess of 100 miles an hour is a dangerous weapon. There's no question about that. Let me ask you this too. Is there any way to stop? And I don't know this. I take it that you do this frequently. So let's take an OJ Simpson style car chase, right? Where like the white Blanco is going 30 miles an hour down the interstate and there's 100 cops following it with their lights on. Is there any way to stop that car without using deadly force? Are you asking with regard to a car or the motorcycle? Yeah, I guess that's a good point. Let's say a motorcycle. Is there any way to stop a motorcycle in a motorcycle chase, even if it's going at 30 miles an hour, without using force that would be likely to cause a serious injury or death? Not that I'm aware of. I mean, there are certain things that you can put out strips on the road or you can do the pit maneuver, but all of those have the potential to harm the driver of the vehicle. So, there is some new technology, but I don't know that you'll get into that, that actually lasso's a car. That wasn't available back then in 2016, is fairly unique technology. But what I would like to point out too, with regard to what Mr. Jones was saying earlier, he's put in this declaration of his client saying I was a very careful driver. I knew what I was doing on this motorcycle. I've ridden motorcycles all my life. That's really not relevant. The fact that he may know what he's doing, Sherifton Loach didn't know that. These other drivers on the road, if a motorcycle is going by them at 100 miles an hour, they don't necessarily know that this individual is supposedly an expert. If a car is coming by you or a motorcycle is coming by you at 100 miles an hour, that person is putting you at risk because you may not be able to perceive that. You're thinking, okay, everybody on the road's driving safely. If you pull in front of that and he hits you, it could kill him, it could kill you. So he's a danger when he's going 130 miles an hour, which is verified in this case. He was also weaving in and out of traffic. He passed other cars. All of that has been held to be dangerous and allow the use of deadly force. Plumhoff makes that absolutely clear. That case, the chase exceeded 100 miles per hour and that's what it says in the case. Here, this chase was going on for over 30 minutes. The Applin County deputies pursued him. He saw them, he looked behind, saw four cars. They called it off because they knew they couldn't catch up to him. When he got to Wayne County, there was a roadblock. He knew they wanted him to stop. And on the way to Wayne County, there was a Wayne County deputy saw him, knew he was traveling excessively, turned around, got his truck up to 90 miles an hour. Mr. Shantz passed him and he was going, the deputy was going 90 miles an hour. So he was driving very dangerously for an extended period of time. When he evaded the second roadblock, he popped wheelies on a side road, got back on the northbound lanes of 341, where he said he just wanted to go home and go to the beach with his mom. And that's when he tried to elude the roadblock where Sheriff Deloach and Lieutenant Eunice were located. And he came to a stop and that's when the shooting occurred. So all of these cases- Does it matter, Mr. Carter, how high the excess rate of speed was? So in other words, if Mr. Shantz had been doing 70 in a 65 mile zone for the 30 minutes, could deadly force have been used to stop him? If he was putting other people in danger, if that was the only thing he- Same set of facts, but he's driving 70 in a 65 mile zone throughout the 30 mile chase. And they just shoot him while he's driving 70? No, same thing here. They stop him with a roadblock, he stops his bike, turns around, pivots, and is gonna head off and keep driving 70 in some other direction. But he's going five miles above the speed limit consistently, not 100. He's going 70 in a 65 mile zone. I think the officers are entitled to qualified immunity in that case. That's not my question. Well, I say yes, excessive force could be used. If he's been driving 70- You've said excessive force twice already. I'm starting to think you're conceding to a reversal. I am not, I'm sorry. I'm only joking with you, I'm only joking with you. But you think that if Mr. Shantz had been driving, you've already told me that you think, I don't wanna put words in your mouth. But you think that if he had been driving the speed limit, he probably could not have been shot, right? Assuming there were no other factors present that are present in this case. No other factors. That is probably correct. If he's driving five miles over the speed limit, you're saying he can be shot. If these other factors in my case are present. No, I'm not giving you any other factors. And so he didn't- He's eluding the police. He's driving, instead of driving the speed limit, he's driving five miles over the speed limit. All right, and he has not evaded two roadblocks. Yeah, he has, but only by driving 70 in a 65 mile zone. And he turns around at the second roadblock, drives back, and tries to elude the third roadblock, still driving 70. He's gonna try to get to 70, but of course, he's just starting to drive away. And when he's starting to drive away from the third roadblock, he gets shot. My first question is not a qualified immunity question. It's a constitutional question. Could deadly force have been used against him? And again, I'm asking you because we have to write the contours of this opinion. And we gotta figure out exactly what to say and what not to say. So what's your best thought about the shooting scenario in that hypothetical? That he's going 70 and he's eluded two roadblocks and he's attempting to evade again. I think they could have used deadly force. Really? I think so. So the five miles per hour difference is the constitutional difference for you? Well, he's speeding. It's a tough- He's shooting a speedster who's not putting anybody in danger. It's a tough question. It is a tough question. But I think he could, I would argue that he could. Based on the chase cases, and he has a deadly weapon. And he shows no intention of stopping. At some point, you do have- He's got a deadly weapon when he's driving 65, and he's already committed a felony of eluding. He's in possession of a deadly weapon. Yeah, he is in both hypotheticals. It's a close call. Okay, thank you very much. Thank you. Okay, Mr. Jones, you've got your rebuttal time. Yes, there are a zillion cases that say that mere possession of a deadly weapon does not justify the use of force. I mean, I've run into that in a lot of other cases. I won't get into that right now. But let's just talk about speed here. Every time I drive to Atlanta, the speed limit is 70. Everybody's going 80. In order to successfully pass someone going 80, you have to go 90. And anybody who goes past you at 80 with any observable speed is going 100 miles an hour. And if it was okay to shoot that person, there'd be a lot of dead bodies on I-20 every day. That's just not the test. I mean, the test is the vehicle has to be used as a weapon. It has to be, there has to be someone in immediate danger. And it has to be an imminent threat, which means present in terms of both time and location. Someone driving fast, sure, is a potential threat to somebody down the road. But here, there was nobody in imminent danger, in immediate danger that was observable to the sheriff. If there was, he wouldn't have unloaded his shotgun on a highway. I mean, flying buckshot is more dangerous than somebody who's driving a vehicle at high speed under control. And I don't think, based on the tone of the questions, I don't think it's really necessary for me to get into the physical evidence here showing that the shots were fired from behind. I had said I was going to do that. But essentially here, all that the case law that we have sets forth a very clear-cut rule, which has been repeated time and time again in shooting cases. And it really comes from Garner, not just Garner, but the Graham v. Connor case, which essentially expanded Garner to all uses of force and sets out certain factors, which they're non-exhaustive factors, but they're factors that you could consider in deciding whether deadly force was appropriate. Mr. Jones, what do you say to the argument that someone who is driving 100 miles per hour consistently for an extended period of time poses much more of a danger to people around him or her than someone who is not doing that? Well, then there ought to be a death penalty if that's the case, and there's not a death penalty for driving 100 miles an hour. That's not the question I'm asking you, though. Well, the question I'm asking is someone with a gun, someone who carries a gun in a grocery store, and I live in rural Georgia. I see this all the time. Someone who carries a gun in a grocery store has a deadly weapon, and they could potentially hurt somebody with it. But until they actually evidence an intent to do that, you can't shoot them. But that's not quite the same as someone who is operating a motor vehicle at 100 miles an hour, right? No. I mean, wouldn't your analogy about the gun be ... I mean, he wasn't shot while he was just standing with the motorcycle. He was on it driving it around. So, I mean, wouldn't your analogy with the gun, someone who carries it out and is pointing it at people and running around with it? No. He's not using the vehicle as a weapon at the time that he shot. Otherwise, I mean, you really want to create a rule that says that you could shoot anybody that's speeding. I talk to lots of experts. I've talked to people. I've been doing this 35 years. I've talked to police academy instructors. I believe that there are ... Seriously, I believe there are hundreds of people who were dead because I lost the Scott DeHarris case. By the way, that's not Scott DeHarris. That's Hokey Pelzer where I did win, okay? I'm in a familiar position. The only one I have from my Supreme Court arguments are the ones that I won. I don't have any pictures. Exactly. I didn't want to pay for that one. Bill Pryor was at the other table. The thing about that case is they made it clear that you don't have to have a prior case exactly on point, but if you have a rule which is stated with obvious clarity to apply to a variety of fact patterns, it can clearly establish the law. The Supreme Court recently ... The court we have now recently reaffirmed that position in the Taylor versus Riojas case. And this court, on its own, in the Vineyard v. Wilson, I think says it even better than the Supreme Court ever did. They say that if some authoritative judicial decision decides a case by determining that X conduct is unconstitutional without tying that determination to a particular set of facts, the decision on X conduct can be read as having clearly established a constitutional principle. In other words, the precise facts surrounding X conduct are immaterial to violation. These judicial decisions control with obvious clarity a wide variety of later factual circumstances. So all these cases where they have said that there is no qualified immunity, say for Mr. Taylor, who slams his car into reverse when he's surrounded by police officers and gets shot, there's no qualified immunity in that case. There's no qualified immunity in some of the other cases that I've cited, which even though some of them are unpublished, they don't establish the law, but they are authority because they cite other cases, published cases, which do clearly establish the law. And I would just encourage you to read the briefs, which is what Mr. Carter wanted you to do anyway, and try to come up with a rule that does as little damage as possible. Thank you. Mr. Jones, Mr. Carter, thank you both very much for the help. We really do appreciate it. Our last case is taken on the briefs today, so our panel is in recess. Thank you.